**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No.24-cr-419 (TSC)** |
| **DAVID CAMDEN** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence David Camden to 27 months of incarceration, three years of supervised release, $2000 in restitution, and a $100 mandatory special assessment for his felony conviction. The recommended 27-month prison sentence falls in the middle of the 24-30 month sentencing guidelines range calculated by the government and Camden as part of his plea and balances the factors articulated in 18 U.S.C. § 3553.

## I.    INTRODUCTION

The defendant, David Camden, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in

1

losses.[1]

Camden, a U.S. Army veteran, joined the riot in its early stages on the West Front at approximately 1:20 p.m. Camden climbed a media tower and encouraged other rioters by waiving a "Three Percenters" flag atop the tower. Thereafter, he proceeded to yell and violently push a bicycle rack barricade into police officers as he attempted to breach the police line and advance on Capitol grounds. Camden only stopped this advance after officers deployed chemical spray against him to preempt further aggression. But Camden was not deterred by officers' efforts. Instead, Camden moved to another location on the West front and sprayed a fire extinguisher toward police officers.

The government recommends that the Court sentence Camden to 27 months of incarceration for his conviction of violating 18 U.S.C. § 111(a)(1). A 27-month sentence reflects the gravity of Camden's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case, ECF 17, for a short summary of the January 6, 2021, attack on the United States Capitol by

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

**B.    Camden's Role in the January 6, 2021, Attack on the Capitol**

In the days preceding January 6, 2021, Camden traveled from his residence in Washington state to Washington D.C. to attend the "Stop the Steal" rally to protest the results of the election. Camden came in response to statements from public officials – including the former president and vice president.

After Camden attended the rally, he walked to the Capitol and entered the restricted Capitol grounds near the West Front. Once on the West Front, Camden moved to a media tower assembled for the upcoming inauguration. He climbed the tower, and, once at the top, waived a "Three Percenters" flag above the mob in a manner to display his enthusiasm to other rioters.[2]



Image 1: *Camden atop a media tower waving a "Three Percenters" flag.*

---

[2] Three Percenters is a far-right, anti-government militia in the United States and Canada.

At approximately 1:20 p.m. – nearly twenty minutes after rioters initially breached the restricted Capitol grounds – Camden approached a bike rack barricade separating United States Capitol Police officers from rioters on the Capitol's West Front. At this location Camden yelled at officers and forcefully pushed a bike rack barricade into the officers. In response, officers successfully repelled Camden's advance and deployed a chemical irritant in Camden's direction to preempt further aggression by him. The below images capture Camden's actions.



Image 2: *Camden approaching the police line.*



Image 3: *Camden pushing a barricade into officers.*



Image 4: *Camden struggling with officers over the barricade as he attempted to breach the police line.*

After this incident, Camden remained on Capitol grounds and joined the mob on the West Plaza. At approximately 2:11 p.m., Camden deployed a fire extinguisher toward a police line assembled to stop rioters from advancing on the Capitol and engulfed the officers in a cloud of irritant spray, as shown in Images 5 and 6 below.



Image 5: *Camden deploying a fire extinguisher at police officers.*



Image 6: *CCTV footage of the cloud resulting from Camden's use of the fire extinguisher.*

***Camden's Post Plea Interview***

Camden agreed to be interviewed by the government as part of his plea agreement. *See* Plea Agreement ¶ 2. During this interview, Camden stated that he decided to go to Washington D.C. prior to January 6, 2021, because he believed there had been election fraud. Once he arrived on Capitol grounds, Camden saw other rioters climb the scaffolding, so he decided to follow suit. Camden said that once atop of the scaffolding, he waived the "Three Percenters" flag to get the attention of those who had joined him in D.C. Camden described seeing flash bangs and experiencing chemical irritants in his eyes while on the scaffolding. Camden said he grew angry after observing officers using these less than lethal riot control methods on rioters. Camden attributed the violence on January 6 to "both sides." He blamed officers for resorting to force and failing to de-escalate the situation by using non-violent riot control techniques, such as telling rioters to leave using megaphones.

### III.    THE CHARGES AND PLEA AGREEMENT

On September 17, 2024, the United Sates charged Camden in a one-count Information with violating 18 U.S.C. § 111(a)(1). On September 27, 2024, the Court convicted Camden of this offense based on his guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Camden now faces sentencing on one count of violating 18 U.S.C. § 111(a)(1), assaulting, resisting, or impeding certain officers or employees.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Camden faces up to 8 years of imprisonment, a term of supervised release of not more than

three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Probation Office agreed with the Sentencing Guidelines offense level calculation in the plea agreement. PSR ¶¶ 37-42. That Guidelines analysis is as follows:

| Count One: 18 U.S.C. § 111(a)(1) | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | | +6 |
| | | **Total** | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | | -3 |
| **Total Adjusted Offense Level:** | | | **17** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated Camden's criminal history as category I, which is not disputed. PSR ¶ 46. Accordingly, Camden's Guidelines range is 24 to 30 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Camden's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Camden approached the Capitol carrying a "Three Percenters" Flag. He immediately climbed a media tower in the center of the developing riot and, once atop the tower, waived the flag triumphantly to encourage the actions of the mob surrounding him. After climbing the tower, he approached a police line and assaulted officers. After officers successfully repelled him, Camden deployed a fire extinguisher to obstruct officers on the West Front. The sequence of Camden's actions on the West Front were very serious, and fully support the government's recommended sentence of 27 months.

### B.  The History and Characteristics of Camden

Camden is a 45-year-old Army veteran and Quality and Commissioning Manager, recently employed by a firm in Tulsa, Oklahoma. PSR ¶¶ 87, 89.

Camden reported that he was raised by both of his parents, but his father was addicted to methamphetamine and gambling. This caused financial strain; nonetheless, his mother always found a way to provide for Camden and his siblings. PSR ¶¶ 54-57. After high school, Camden enlisted in the Army and served three years in the 82nd Airborne Division in utilities and equipment. While Camden had used some illicit substances as a juvenile, he "partied hard at times" in the Army and as a result was temporarily demoted, lost pay, and had to do extra duty. After his time in the Army, Camden became addicted to cocaine and methamphetamine for approximately

four years. However, he attended various programs, including through the Veterans' Administration, and has been sober for over 20 years. PSR ¶¶ 75-81. In 2008, Camden earned an Associates' Degree in Applied Science, and he has a long history of employment, most recently in management with a firm in Tulsa, Oklahoma, earning a six-figure salary. PSR ¶¶ 88-93. He is married and owns his own home as well as a rental property. PSR ¶¶ 58, 95. His criminal history is limited to a conviction for driving with a suspended registration at age 23, and failing to appear in court at age 24, for which he was sentenced to 11 days in custody. PSR ¶¶ 44, 45.

Yet, despite having overcome hardships and despite the life he built for himself, Camden chose to participate in a riot and assault police officers. He encouraged other rioters as they accumulated on the West Front before successfully overpowering the established police line. Camden's stable family life, his long history of good, well-paying jobs, his decades of sobriety, his age at the time of the Capitol riot (41), and his minimal criminal record did not deter him from committing the very serious criminal offense conduct charged in this case.

Unlike many crimes generally, the criminal offenses of January 6 were not crimes of passion, desperation, or opportunity: Camden's crimes were ideologically motivated. In these circumstances, nothing about Camden's secure, established life lessens his propensity to commit this type of offense again, should similar circumstances present themselves.

Finally, it is commendable that Camden served his country for three years in the United States Army – but his conduct on January 6 was entirely contrary to the oath that he took to support and defend the Constitution.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Camden's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Camden also weighs heavily in favor of a lengthy term of incarceration.

While Camden has accepted responsibility for his conduct by pleading guilty, his remorse is clouded by his continued attempts to minimize his offense conduct by blaming police officers for instigating his actions. At the plea hearing, Camden made representations to the Court that his conduct was – somehow – a result of the actions of officers. Camden stated that officers assaulted him with the bike rack, forcing the Court to follow-up with Camden to ensure he, in fact, stipulated

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

to assaulting officers with a bike rack as described in the statement of offense.[5] In his post-plea interview with the government, Camden again attempted to shirk responsibility and blame riot control tactics by police for his violent conduct and those of other rioters. Camden attributed blame to "both sides."

Camden's equivocation about the events of January 6 underscores the need for a sentence that reflects the truth about those events. Camden and other rioters put officers in the dangerous situation they faced on January 6, not the other way around. Camden's equivocation about where responsibility lies also suggests he could be persuaded to engage in similar unlawful conduct in the future, and therefore that a lengthy term of incarceration is warranted to provide specific deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

---

[5] The government does not have a transcript of the plea hearing but offers generalizations of its recollection of Camden's colloquy with the Court.

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Daniel Phipps*, 21-cr-44 (CJN), the defendant, like Camden, assaulted officers by pushing them but did not otherwise attack them or use weapons. Both defendants pled

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

guilty to violating 18 U.S.C. 111(a)(1).[8] While Phipps entered the Capitol and Camden did not, Phipps assaulted officers outside the Capitol long after he left the building, and so did not assist the storming of the Capitol building by a dangerous mob. In contrast, Camden did the opposite by climbing the media tower, waiving a "Three Percenters" flag, assaulting officers, and deploying a fire extinguisher on the West Terrace as the mob began to overwhelm police officers. Judge Nichols calculated Phipps' guidelines range to be 24 to 30 months – the same range faced by Camden – and sentenced Phipps to 27 months' incarceration and 36 months' probation. Thus, while each defendant's conduct offers distinct aggravating factors, both pled guilty to their assaultive conduct outside the Capitol by pushing against officers.

*United States v. Kevin Creek*, 21-cr-645(DLF), also involved a defendant who pled guilty to one count of violating 18 U.S.C. § 111(a)(1) and faced a guidelines range of 24 to 30 months' incarceration. While on the Lower West Terrace, Creek shoved one officer and kicked another, and threw a thick strap with a metal buckle at the line of officers but did not injure the officers. Like Camden, Creek never entered the Capitol. Judge Friedrich sentenced Creek to 27 months' imprisonment and 12 months of supervised release. Both Creek and Camden pled guilty to the principal charge of 18 U.S.C. 111(a)(1) having never entered the Capitol for assaults on the West Front, offering the Court a useful factual comparator.

---

[8] Phipps pled guilty to an indictment that included one count of violating 18 U.S.C. § 231(a)(3) and four misdemeanor charges in addition to the most serious count, charging a of violation of 18 U.S.C. § 111(a).

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Camden must pay $2,000 in restitution, which reflects in part the role Camden played in the riot on January 6.[10] Plea Agreement at ¶ 12. As the plea agreement

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Camden's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 107, 123.

## VIII.   FINE

Camden's convictions for violations of 18 U.S.C. 111(a)(1) subject him to a statutory maximum fine of not more than $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Camden's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Camden to show a present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Camden has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $10,000 to $95,000. U.S.S.G. § 5E1.2(c).

IX.    **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of incarceration, three years supervised release, $2000 in restitution, and a $100 mandatory special assessment for his felony conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     /s/ Eli J. Ross
        Eli Ross
        Assistant United States Attorney
        Bar No. IL 6321411
        U.S. Attorney's Office for the District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20530
        Phone: (202) 297-1515
        Email: Eli.Ross@usdoj.gov

18