# IN THE US DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | |
| v. | : | No. 1:24-cr-419 |
| | : | |
| DAVID CAMDEN | : | |
| | : | |
| Defendant | : | |
| | : | |

## SENTENCING MEMORANDUM

Mr. Camden is before the Court for sentencing on a pre-indictment plea to one count of assault on law enforcement under 18 U.S.C. § 111(a). The charge arose from a brief struggle at the bike racks that police quickly repelled. There are no reported injuries to police and Mr. Camden did not attempt to enter the building. He left the area voluntarily upon receiving instructions to do so in a text message from D.C. Mayor Muriel Bowser.

There is significant mitigation. Mr. Camden is an Army veteran who later became homeless and addicted to drugs, at times living under bridges. He has been sober for 20 years and become a successful professional while assembling an extraordinary record of volunteerism.

Mr. Camden has a compulsive personality and suffers from General Anxiety Disorder. He keeps himself in check with his volunteerism and other healthy

activities like Yoga. During the pandemic, Mr. Camden did not have these outlets which we believe is large part of why he acted as he did on January 6.

Mr. Camden is deeply remorseful for his actions. He took responsibility at the earliest possible time (pre-indictment). He has expressed sincere remorse to friends and coworkers and authored a letter of apology to the police.

For all of these reasons and those explained below, we ask the Court to consider a sentence of home detention of appropriate length with community service and a substantial fine.

## I.    Law of Sentencing

Federal sentencing is governed by 18 U.S.C. § 3553(a), which requires the sentencing Court to consider a multitude of factors in determining the appropriate sentence, including but not limited to the defendant's background and characteristics, the need for deterrence, and the need for rehabilitation. In considering these factors, section 3553(a) directs the sentencing court to "impose a sentence *sufficient but not greater than necessary*" to satisfy the purposes of sentencing as set forth in the Sentencing Reform Act (emphasis added).

It is well settled that the Federal Sentencing Guidelines are purely advisory, and that a district court may not presume a sentence within the Guidelines to be reasonable. *Booker v. United States,* 543 U.S. 220 (2004). The Court must calculate the applicable Guidelines but may not rely on that range alone to determine the

sentence. *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007). Instead, the Court must consider all Section 3553(a) factors.

The applicable law for individual sentencing factors will be discussed in greater detail in the individual sections below.

## II.    Sentencing Factors

### a.    Sentencing Guidelines Calculation

Under guideline § 2A2.2 the PSR gives Mr. Camden Base Offense Level 14, plus 6 levels for Official Victim, and a reduction of three for acceptance. The adjusted offense level is 17. With zero criminal history points and thus a criminal history I the incarceration range is 24 to 30 months (Zone D) and a fine of $10,000 to $95,000. Mr. Camden has the ability to pay a fine. In most cases under § 2A2.2 with 17/I guidelines, district courts sentenced below the low end of the range. PSR ¶ 127.

### b.    History and Personal Characteristics

#### i.    Childhood, Army and Rehab Experiences

Mr. Camden was born and raised in Nebraska. His early life was disrupted by his father's drug addiction which destabilized the household and caused financial strain. To help support the family, Mr. Camden's mother had to leave her children and enter the workforce. As a result, the defendant and his siblings grew up "largely

unsupervised at home." PSR ¶ 54. Mr. Camden's mother recalls this painful period

of their lives as follows:

> By the time David was beginning 7th grade, his father had lost his job,
> and I had gone to work to support our family. While I was working,
> David's dad was supposed to be supervising the children, which I soon
> discovered wasn't happening.
>
> As a teenager, David got involved with drugs despite my attempts to
> help him get away from using them (through group and individual
> counseling as well as court ordered community service), I wasn't
> successful in accomplishing that.

Ex. 1. Mr. Camden recalls struggling socially in high school and "feeling like I

would be accepted if we just had money to afford the same things the other kids

had." Ex. 2 (Camden autobiographical statement).

Mr. Camden joined the Army in 1997. PSR ¶ 85. The Army assigned him to

the elite 82nd Airborne Division as a Utilities and Equipment Repairman. *Id*. at ¶ 57.

According to online sources, the 82nd is "the Army's most strategically mobile

division" and has participated in many of the most famous battles of history

including the Meuse-Argonne Offensive, the Normandy invasion, and, more

recently, the parachute assault on Saddam International Airport in 2003. Mr.

Camden earned awards for his service including Airborne and Expert Marksman and

was honorably discharged. *Id*. at ¶ 87. Mr. Camden is proud of his military service.

However, by the time he left the Army Mr. Camden had become addicted to

methamphetamine. He returned home to live with his parents but could not hold a

job.  His mother and sister both recall making the difficult decision to cut him off from family support rather than continue as "enablers" of his addiction.  As David's mother writes "I finally gave him a 30-day ultimatum...at the end of 30 days David still wasn't working, so I told him he had to leave.  It was the hardest thing I've ever done as a mother."  Ex. 1.  His sister Melissa recalls it this way: "we were advised that we were only enabling him...with heavy hearts, we made the heart wrenching decision to step back from his life."  Ex. 3.

The family's decision to help David through "tough love" worked.  After leaving home, Mr. Camden continued abusing methamphetamine for a time, living out of his car.  He later sold the car for drug money and slept in homeless shelters or outdoors.  However, in 2004 he checked into a VA facility and began a grueling regimen of drug rehabilitation which he has described to the Court in his autobiography.  One of Mr. Camden's friends from this period, Chuck Boerngen, recalls that: "we coupled together along with a few other gentlemen who were also facing addiction problems...Dave and I, along with several others, conquered the adversity together."  Ex 4.

### ii.  Camden's Professional Career Upon Achieving Sobriety

Free of drugs, Camden immediately embarked upon what would become an extraordinary educational and employment record.  Mr. Boernegen writes that, after rehab, "we both attended Northeast community college together as non-traditional

students and both graduated with honors.  Dave stuck around long enough to figure
out with his ambition and knowledge that Norfolk wasn't the place for him." *Id*.  He
received an associate's degree in applied science in 2008.  PSR ¶ 83.

The same year, Mr. Camden began work at Burns & McDonnel, a
multinational construction, architecture and engineering firm based in in Kansas
City, Missouri.  *Id*. at ¶ 91  The firm hired David as a mechanical CAD drafter in the
federal and aviation department.   The company promoted him to Nuclear Weapons
Program Drafter and later to Senior Commissioning Specialists, making a six-figure
salary.  *Id*.  Jeri Reese worked with David and described his work ethic as follows:

> He was a dedicated commissioning specialist/engineer...David and I
> became close colleagues quickly because of his willingness to help
> others.  David would always be the first person to raise his hand to help
> a team-mate with a challenging project and also be willing to work after
> hours if needed.  One thing that I especially remember about David is
> his commitment and dedication to professionalism and integrity in and
> outside of the workplace.  For example, he would always show up to
> work early with a smile on his face and his deliverables were organized
> and timely.  He also was vigilant about billing his time in an honest
> manner.  I never once had to question his integrity on his time sheet!

Ex. 5.  Fellow engineer John Danilson has written to the Court in praise of Mr.
Camden's technical abilities:

> His role requires him to meticulously review our designs and ensure
> proper implementation.  During this time, I witnessed firsthand his
> exceptional analytical abilities and his dedication to accuracy and
> thoroughness.  On one occasion, his insightful questions regarding a
> complex control system for an automated painting process uncovered a
> critical design flaw, which we were able to correct thanks to his

diligence.    This experience demonstrated not only his technical
competence but also his commitment to ensuring positive outcomes.

Ex. 6.

Mr. Camden left Burns & McDonnel in 2020 to work for Affiliated Engineers

in Seattle, Washington.  Shortly after Mr. Camden arrived, the company announced

that all employees and contractors had to receive the COVID vaccine to continue

working.  As a relatively young man without COVID risk factors, Mr. Camden

concluded the risks of the vaccine outweighed the benefits, so he chose not to be

vaccinated.  The company fired Mr. Camden.

After leaving affiliated engineers, Mr. Camden started at his most recent job

with Manhattan Construction (and also relocated from Seattle in the process).  PSR

¶ 89.  He worked as a Quality and Commissioning Manager until being fired shortly

after the Court unsealed this case.  Although Mr. Camden's time at Manhattan

Construction ended prematurely, his abilities and work ethic made an impression on

his coworkers.  Ronnie Wood relates that:

> David joined our large team that performs maintenance, upgrades,
> renovations and other construction services...David eclipsed many on
> our team in each of these categories as our Senior Quality Control
> Manager.  I was consistently appreciative of his unique work ethic
> coupled with humility...He did not ask for credit, nor seek to move
> into a more senior level role, but engaged with me and each of our co-
> workers as to how e could use his skillset in commissioning, heating
> ventilation and air conditioning or project management professional
> skills to make everyone around him more efficient, productive and
> successful.

Ex. 7.

Prior to separating from Manhattan Construction, David had already laid some groundwork for turning his hobby of homebrewing coffee into a business. He and his wife incorporated an LLC and began to make some small sales to friends. The coffee is of extremely high quality and attractively packaged. As a convicted felon Mr. Camden may face difficulty re-entering his field. Although it is uncertain, it is possible that the coffee business may become a bigger part of the Camdens' lives.

### iii. Volunteer Work with the Homeless, Addicts, and Animal Rescue

The 12-step Narcotics Anonymous program that saved Mr. Camden's life also includes 12 principles necessary to maintain sobriety for life. The principles include Honesty ("being truthful with oneself and others") and Surrender ("letting go of control and surrendering to a higher power"). The penultimate 12th principle is Service: helping others and giving back to the recovery community. Mr. Camden has lived this principle for 20 years in the following ways:

#### 1. Outreach to the Homeless and Addict Community

At counsel's urging, Mr. Camden has put together documentation on his accomplishments in volunteerism for the Court's review. Ex 8. The information is corroborated where possible.

In his early years of sobriety Mr. Camden assumed a role of leadership/service in the recovery community. AA/NA groups do not have a leadership structure as

such, but they do need people to take responsibility for the basic logistics of the meetings. Mr. Camden filled this role for two years and his duties included setting up meetings and public relations. This was all before he graduated community college and entered the workforce.

Since beginning his career, Mr. Camden continued to make time for volunteerism including helping at foodbanks, homeless shelters and contributing generously to charitable causes. Some of his endeavors show remarkable insight such as his decision in 2018, seemingly unprompted by anything, to register for the "Beyond the Streets" training on "communicating with people in personal crisis."

Although they have only been in Arkansas a short time, the Camdens have already found ways to give back. Denise Patterson, from Mr. Camden's church writes that:

> I met Dave about a year ago when he joined our Life Group at Church. Our group prepares a hot meal, sack lunches, and a continental breakfast every week for those at the 7Hills Homeless Shelter...while he understands the need to feed them his true desire is to provide counseling to help them...he knows firsthand what it is like to live on the streets and overcome addiction.

Ex. 8. Most recently, in 2024, Mr. Camden and his wife helped to rebuild areas damaged by tornadoes.

## 2. Animal Rescue

Mr. Camden's work in animal rescue is also deeply tied to his recovery story. As Mr. Camden put in his autobiography, "along my journey I developed a deep

connection and love for dogs.  Given my experience with homelessness, I was drawn to shelter dogs and made it a part of my mission to help as many as possible."  Mr. Camden makes a point to focus on dogs with the lowest chances of adoption due to age, injury, or behavioral issues caused by trauma.  As Denise Patterson as written to the Court, "Dave also has a love for animals like no one I have ever known.  He will do whatever is needed to find a lost dog its home...he currently has two rescues, one oof which lived on the street for years and had been shot multiple times."  Ex. 9.  *See also*, Ex. 7 ("I specifically remember an elderly woman who works in the campus cafeteria mentioning David and his rescue work for abused dogs and how they connected over a shared concern").

### c.  Facts and Circumstances of the Offense

#### i.  David Camden Relevant Personality Traits

Before turning to the facts of January 6, a few observations on Mr. Camden's temperament and personality may prove helpful to understanding his role in the events of that day.

First, considering all the facts of his life, it's fair to say Mr. Camden has an intense personality and the ability to hyper focus on tasks.  For the most part he seems to have channeled this into overwhelmingly positive outlets such as his career and extensive volunteer work.  Occasionally these same traits operate in a negative way such as in his vulnerability to serious addiction.  Over the past 20 years of

sobriety Mr. Camden developed habits of coping with anxiety such as Yoga and other forms of exercise. During the pandemic, like so many others, strict Covid policies deprived him of these outlets.

Second, Mr. Camden reports a tendency to dramatic fight or flight responses in stressful situations, probably accentuated by serving in an elite military unit. This can also be a positive thing such as the episode when he literally lept into a frozen lake to save a drowning dog. In this case however, as explained in more detail below, it probably contributed to his unfortunate response to the confrontation between police and protesters on 1/6.

Third, as discussed further below. Mr. Camden has recently been re-diagnosed with "Generalized Anxiety Disorder." Per the DSM, common symptoms of this disorder include "restlessness or feeling keyed up or on edge" and "mind going blank." This also clearly contributed to his out of character behavior at the rally.

### ii. Before January 6

For purposes of evaluating specific deterrence, it is notable that Mr. Camden was not motivated to attend the January 6 rally by Q-Anon style internet conspiracies or by a disordered devotion to any political leader. As he would later tell the FBI, "it was not a life goal of CAMDEN's to see Trump up close and personal." He was not an active social media user and deleted the one account he did have (Facebook) around Thanksgiving 2019 because he was using it too much.

Mr. Camden does not have a background of being particularly political, let alone being a member of organized activist groups. David's brother Jeff bought him the "III percenters" flag he would later be photographed waiving. Neither brother seems to have known the significance of the "III%" emblem, they merely liked the aesthetic design of the flag. The government has no evidence Mr. Camden was a member of the III percenters or any political group, which he was not.

As a technical person who has worked on some of the largest and most complex government programs of recent years, Mr. Camden took an interest in statistical analyses of the 2020 vote. He particularly recalls reading the following article released November 24, 2020. *See*, https://votepatternanalysis.substack.com/p/voting-anomalies-2020 (last visited 1/1/25). The highly technical article argues that 4 vote drops in swing states that heavily favored the Democratic ticket were so statistically improbable as to be cause for concern. A change in result in any 3 of these states would have changed the outcome of the national election. Mr. Camden also found worthy of protest compelling evidence of media and intelligence community manipulation of the election. The most prominent example of this was the NY Post story about compromising material found on the Presidential son's laptop which was suppressed by social media companies and falsely described as Russian disinformation by 51 prominent intelligence professionals. *See*, https://judiciary.house.gov/media/in-the-

news/facebook-execs-suppressed-hunter-biden-laptop-scandal-curry-favor-biden-harris (last visited 1/1/25).

As the Court knows, not only President Trump but other political leaders, former military officers, and other authority figures expressed doubts about the election. As he would later explain to the FBI, Mr. Camden particularly recalls a January 4 speech by Vice President Mike Pence which the Washington Times reported as follows:

> As Mr. Pence campaigned for Republican Sens. Kelly Loeffler and David Perdue at a church in Milner, many in the crowd began chanting about the vice president's upcoming role as president of the Senate... "Stop the steal!Stop the Steal! Stop the steal!" they changed repeatedly...Mr. Pence eventually addressed the upcoming vote in Congress. "I know we all have got our doubts about the last election," the vice president told the crowd. "I want to assure you that I share the concerns of millions of Americans about voting irregularities. I promise you, come this Wednesday, we will have our day in Congress."

Available at: https://www.washingtontimes.com/news/2021/jan/4/trump-supporters-georgia-tell-pence-stop-steal/ (last visited 1/3/25).

Camden had personal reasons to attend the rally as well. His brother Jeff was also interested in the election and David viewed it as an opportunity for the two of them to spend some time together. Jeff Camden lived in Minneapolis so David met him there and the drove to Washington DC with four other people. During Mr. Camden's debrief, he stated that: "

> the trip was more about spending time with CAMDEN's brother. CAMDEN's brother is the one male in CAMDEN's family that

CAMDEN has not lost.  CAMDEN wanted to spend time with his brother and see the day in Congress like Pence talked about.  Camden had originally thought it was just going to be CAMDEN and his brother on the trip.

We submit that Camden's motivations for attending January 6 demonstrate two important points for sentencing.  First, he is not the type to get riled up by internet conspiracies.  Secondly, he did not travel to Washington D.C. with the intent to disrupt the certification or engage in violence.

### iii.  On January 6

Prior to approaching law enforcement, Mr. Camden ascended a media tower and was later filmed there waiving a flag.  The government states several times that Mr. Camden's flag waiving was intended to "encourage" other rioters attempting to displace police, but there is no direct evidence of this.  Mr. Camden never stated, "drive them back", "this is our house" or any of the more aggressive chants recorded on videos from that day.  There is no evidence the flag waiving was directed towards rioters confronting police in a disorderly way, or even that such confrontations were simultaneously occurring in his vicinity or line of sight.  His flag waving was done pursuant to the general atmosphere of exuberant patriotism that prevailed during all phases of the January 6 rally and also, as Mr. Camden explained to the FBI, to "get the attention of the people he traveled to D.C. with" who at that point he had become separated from.  The fact that the photo depicts him facing the crowd with his back to the Capitol tends to corroborate this.

After descending the scaffolding, Mr. Camden approached the bike racks. The atmosphere was tense and Mr. Camden at the time became angry that police were using aggressive tactics against protesters such as deploying "flash bangs." He briefly struggled with police at the bike racks. The police quickly subdued him by pushing him forcefully down some stairs and deploying mace, severely injuring Mr. Camden's leg. Camden discharged a fire extinguisher in the direction of the police line in frustration at having been injured by police. Mr. Camden's reactions were not justified and he regrets them. He believes the tension of the pandemic combined with his own tendency to react dramatically in stressful situations caused this out of character behavior. Mr. Camden has always respected police and wishes he had not done what he did.

Notably, after the incident at the bike racks, Camden did not proceed any further towards the Capitol building. He sang patriotic songs with other protesters until receive a text message from the Mayor imposing a curfew. Camden left the area in accordance with the mayor's instructions.

### iv. The Government's Framework For Evaluating Jan 6 Cases

In other cases, the government has proposed the following framework for evaluating the facts of Jan 6 cases:

> The Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors to include: (1) whether, when and how the defendant entered the Capitol building; (2) whether the defendant encouraged or engaged in violence; (3) whether the

defendant encouraged or engaged in any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.

*United States v. Mark Leffingwell*, 21-CR-5-ABJ, ECF 31 at 14 (government sentencing memo).

Most of these factors weigh strongly in Mr. Camden's favor: he did not enter the building, he did not destroy property, encourage others to commit violence, destroy evidence, post on social media, he cooperated with law enforcement (by immediately following the Mayor's curfew text), and has shown genuine remorse. The only factor weighing against Mr. Camden is of course number (2) which we do not wish to minimize other than to point out there were no injuries and the police quickly got the better of Camden. The government's 9 factor test therefore gives ample basis for a below guidelines sentence.

### d. Comparable Cases and the Need to Avoid Unwarranted Sentencing Disparities

Mr. Camden offers the following comparator cases for the Court's guidance in applying this factor:

*United States v. Leffingwell* involved a military veteran who entered through the Senate Wing entrance and faced a protective line of officers. 1:21-CR-5-ABJ

ECF 31 at 2. He struck two officers in the head. *Id*. According to the government Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id*. at 8. The government went on to say "[t]hough [Leffingwell's] first punch met riot gear, he was undeterred, and kept punching until he was eventually pacified." *Id*. at 15. He faced guidelines of 24-30 months. *Id*. at 8. The Court sentenced him to 6 months incarceration and 24 months supervised release. ECF 51. Here, Mr. Camden was not punching or otherwise striking law enforcement but was pushing against a bike rack, which has to be considered significantly less aggravated. The government itself acknowledges this important distinction when discussing *United States v. Phipps* where it states "the defendant, like Camden, assaulted officers by pushing them but did not otherwise attack them or use weapons." Gov't Memo at 14.

*United States v. Council* involved "a former college football player" who entered the Capitol through the NW Plaza despite having been pepper sprayed by police and "lowered his head, stuck out his arms, and rammed into a line of police officers, pushing them back." 1:21-cr-207-TNM, ECF 64 at 2. After Jan 6 Mr. Council "continued to embrace conspiracy theories, advertise himself as a political prisoner, and support others in their defiance of the government." ECF 64 at 2. The Court gave him 60 months' probation and 100 hours of community service based on

factors including Mr. Council's mental health.  ECF 75.  Although Mr. Camden is certainly more high-functioning than Council, it is equally true that his mental health conditions contributed to the case, as explained elsewhere in this filing.

In *United States v. Davis* the defendant left a digital record of violent comments in the days  leading up to the certification.  1:21-cr-595 ECF 52 at 3-5. On Jan 6 Mr. Davis "marched with other Proud Boys and joined the rioters who stormed the West Front of the Capitol."  *Id*. at 2.  The government described his subsequent conduct as follows:

> [James] Davis was at the front of the group of rioters as they attempted to breach the defense perimeter.  Davis wielded a long wooden stick as he directly confronted police officers.  He first pushed against a police officer's riot shield with his left hand, which was holding the stick. Davis then moved towards a second officer, pushed back against the officer's outstretched baton, put his hand on the officer's shoulder, and yelled at the officer as the officer attempted to repel Davis.  Davis only stopped after experiencing an apparent medical issue and collapsing. He later sent a long message to his fellow Proud Boys bragging that he was at the front of the line and imploring the rioters to move forward, and claiming that he used his "beefy stick" to force the police to retreat.

*Id*. at 2.

After Jan 6, Mr. Davis destroyed evidence and directed others to do so as well. *Id*. at 16-17.  He also created a fraudulent fundraising page.  *Id*. at 16.  The Court sentenced him to 2 months incarceration.  ECF 64.  Mr. Davis's case is more aggravated than Mr. Camden's from just about any perspective.

The Government's first comparator case is *United States v. Daniel Phipps* where the defendant received 27 months for his § 111(a)(1) conviction. 21-cr-44-CJN. Gov't Memo at 14. As noted above, the government describes Mr. Phipps' assaultive conduct as being roughly comparable to Mr. Camden's. However, Mr. Phipps entered the building whereas Mr. Camden left promptly when instructed to do so by the Mayor of DC via mass text message. The government argues that the offense conduct balances out because, in its view, waiving the flag on the tower and deploying the fire extinguisher was of roughly equal aggravation to actually entering the building. We strongly dispute this because the reason January 6th is viewed as so significant by so many is because the transfer of power was interrupted in a way which caused lawmakers reasonably to fear for their safety. Mr. Phipps participated in this aspect of January 6 while Camden did not. The very first sentence of the government's sentencing memo in *Phipps* emphasizes this fact: "the defendant, Daniel Phipps, participated in the January 6, 2021 attack on the United States Captiol-a violent attack that *interrupted the certification of the 2020 Electoral College vote count* [and] threatened the peaceful transfer of power after the 2020 presidential election." ECF 61 at 1 (italics added).

Also, the government's comparison of this case to *Phipps* leaves out many aggravating facts. Phipps had "an extensive criminal history involving arrests and convictions for driving under the influence, driving without a valid license and

possession of marijuana and drug paraphernalia." *Id.* at 21. He had an outstanding warrant pending on Jan 6. *Id.* He was unemployed at the time of his arrest. ECF 77 at 74. His status as a Navy veteran was presumably mitigating, but at the same time the Court recognized that he received a general discharge under honorable conditions (downgraded from "honorable discharge").

In the period between Nov 3 and Jan 6, Phipps made a string of violent and profane posts on social media including pictures of firearms, bullets and a photo of a gallows captioned "government repair kit." *Id.* at 6. Phipps entered the Capitol on his second try after first being repulsed by police. *Id.* at 2. Phipps' assaults occurred when police were attempting to force him to leave the grounds against his will at 4:30pm. *Id.* He pushed and shoved no less than four MPD officers. *Id.* He screamed at the officers "You know this isn't the end. You know this isn't over. This is just the beginning. This is just the beginning!." *Id.* The Court found Phipps' refusal to leave significant. ECF 77 at 74 ("he aggressively and physically and, in my view, violently resisted law enforcement's attempts to get him and others to leave the grounds."). Mr. Phipps was not repentant after the enthusiasm of the day wore off. On January 8th he boasted of having "helped take the Hill." *Id.*

The government's other comparator is *United States v. Kevin Creek.* 21-cr-645-DLF which was a § 111(a)(1) case with the same guidelines where the Court gave a 27 month sentence. Gov't Memo at 15. As the government acknowledges,

Creek "shoved one officer and kicked another, and threw a thick strap with a metal buckle at the line of officers but did not injure the officers." *Id*. The government argues his case is comparable to Camden's because they both had the same charge, no injuries, and neither entered the Capitol. *Id*.

Here again, the government leaves out some aggravating factors. In addition to pushing, Creek struck an officer in the face. ECF 48 at 14. He also appeared to target a particular Capitol Policeman for harm:

> Creek then made a beeline for a U.S. Capitol Police (USCP) officer...who was attempting to protect himself behind a bike rack barrier and a police shield. Creek went around the bike rack barrier, gave Officer R.S.E. a hard shove in the shoulders, and then kicked him, causing Officer R.S.E. to fall backwards to the ground. Officer R.S.E. tried to get up when another rioter pushed him back down to the ground.

*Id*.

Creek also attempted to breach the Capitol, which takes away much of the force of the government's argument that the cases are comparable because neither man entered the building. Creek informed a medical treatment provider that he tried to get inside the Capitol but went to the wrong door which was guarded by officers to prevent him entering. *Id*. at 19. He later admitted to FBI agents that he brought a knife to the protest. He falsely stated to the FBI that an associate was trying to get him trouble by claiming he assaulted police and refused to admit his assaults even after watching them on video. *Id*. at 48. He never expressed remorse and in fact continued to deny offense conduct right up until sentencing:

> Although he nominally accepted responsibility for his assaults on Officers J.C.M. and R.S.E. as a part of his plea agreement, Creek has shown no remorse for his actions on January 6. In fact, in his statement to the PSR writer, he has denied conduct to which he pleaded guilty before the Court.

*Id*.

### e. Collateral Consequences

Mr. Camden has already suffered much punishment from this case. As described above, he worked very hard to establish himself in his career. After the case documents were released, undersigned counsel engaged with counsel for the company to attempt to save Mr. Camden's job. Although his performance was excellent, there was apparently one client with strong objections to a January 6 defendant continuing to be employed at the company, so he was fired. Mr. Camden remains unemployed except for some work on his burgeoning coffee business.

Secondly, it is undeniable that the police quickly got the better of the brief struggle with Camden. As can be readily observed from the video, after Mr. Camden pushed on the bike rack, the policemen immediately pushed back with enough force that he fell the ground and deployed mace. Mr. Camden fell down some stairs, tearing his ACL and meniscus in an injury that would later require surgery. To be clear, we are not claiming the police used unjustified or excessive force in disengaging Mr. Camden from the bike rack. The point is that that the police

inflicted a bit of their own "just punishment" and "specific deterrence" right there on scene, removing at least some of this Court's burden to vindicate those factors.

Finally, there is a real possibility that incarceration may impose a level of punishment for Mr. Camden far beyond what is necessary to achieve the purposes of sentencing. As the Court is aware drugs are widely available in most prisons and the depression that most inmates experience is also a trigger for relapse. Furthermore, it has anecdotally come to counsel's attention that many Jan 6 prisoners who would otherwise be eligible for a camp have been housed low or medium security facilities due to the BOP's view of this class of cases. To be sure, many persons sentenced to prison have a history of substance abuse and we are not contending it should be treated as a get out of jail free card. However, we submit that the potential for relapse can legitimately be considered as real collateral consequence that can effect the Court's calculus of exactly how "punitive" on a day-for-day basis any sentence of incarceration will be.

### f.  Effect on Third Parties

A distinct type of collateral consequence that the Court can legitimately consider is the effect of incarceration on innocent third parties. As detailed in letters to the Court, Mr. Camden is the only member of his family currently in a position to provide support to his widowed mother and 90-year-old grandmother. The Court can consider the effect on these persons in imposing sentence. *See*, *e.g. United States*

*v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005)(on remand of bank fraud case, district court may consider defendant's role as caretaker for brain-damaged son even though alternative means of care existed); *United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008)(sentence of probation affirmed where justified by atypical nature and circumstances of the felon in possession case and by defendant's need to care for her nine-year-old developmentally disabled son); *United States v. Crawford*, 2007 WL 2436746 (E.D. Wis. 2007)(variance granted in part due to impact incarceration would have on defendant's five children); *United States v. Bortnick*, 2006 WL 680544 (E.D. Pa. 2006)(seven day sentence despite 51-63 guidelines in part based on defendant's responsibility for severely handicapped son).

### g. Specific Deterrence

Mr. Camden has shown true remorse for his offense. He discussed the offense honestly during the FBI debrief and wrote an apology letter to the Capitol Police. Ex. 12. His friend Lillian has written to the Court that, "Dave is not only sorry for his actions, but I believe this has caused him a lot of personal paint, physically, mentally, and emotionally." Ex. 10. Ronald Wood, a coworker from David's most recent job, vividly recalls the effect this case had on him:

> One day I could see David was not himself, and I asked him into a private conference room to have a 1:1 conversation. He informed me of his legal situation, his incredible distress and his perspective on the events. We were able to pray together and I encouraged him to step into responsibility and face forward just as he did in his daily work. I have witnessed him following through and continuing to be an example

of doing what is right and acting with integrity knowing there are amends to be made.

Ex. 7.

As discussed above, Mr. Camden's offense was the result of his intense personality and occasionally extreme reactions to stress or danger, exacerbated by the general decline in mental health that most Americans experienced during the COVID pandemic. Once the regime of pandemic restrictions was mercifully lifted, Mr. Camden was able to resume the activities which helped him maintain an even keel such as Yoga. Lillian, the manager of his local Yoga gym has written to the Court about David's dedication to this healthy practice. Ex. 10.

But Mr. Camden has taken additional steps as well. After pleading guilty in this case, Mr. Camden sought treatment from the VA. Ex. 11. As discussed above, his treatment providers diagnosed him with "General Anxiety Disorder." The treatment providers recommended psychotherapy and new strategies to maintain "mindfulness." The treatment and strategies should help him avoid a repeat of the unfortunate combination of circumstances that led to the encounter with police on January 6.

Finally, recognizing that he did not comport himself well while attending his first and only political rally. He recognizes the high emotions, potential for disorder, and the passion of crowds may not be the best atmosphere for a man of his

temperament. Just as preventing addiction relapse may involve avoid particular "places", Mr. Camden has resolved not to attend future rallies.

The government states in its memo that Mr. Camden "attributed the violence on January 6 to both sides" seemingly suggesting a denial of responsibility. The actual quote from the government's own report of the interview is "many things on both sides could have been done differently." The context is Mr. Camden stating he wished there had been some announcement via loudspeaker or some other means informing protesters to vacate the area. Mr. Camden would have obeyed as he did the Mayor's curfew text message. These comments were in no way meant to excuse his later conduct, which not in any sense justified by the crowd control tactics the police chose to use.

### h. General Deterrence

The Court has already achieved significant deterrence from the January 6th prosecutions and the particular result in Mr. Camden's case is unlikely to have a material effect on this factor. His case has not received much news coverage apart from a few perfunctory stories in local Arkansas papers.

In fact, a relatively lenient sentence for Mr. Camden may counterintuitively achieve more in the way of reducing crime than a relatively severe sentence would. As the Court is aware, the ultimate purpose of the deterrence factor is crime reduction and the particular means is by hopefully leading would be criminals to

engage in a rational calculation that the potential costs of getting caught outweigh the potential benefits of getting away with it.

Here, Mr. Camden has an extensive record from before his arrest of working with men at high risk of offending, specifically the homeless population and addicts (which often overlap).  The efforts of Mr. Camden and other volunteers helps these men fix their lives and thereby greatly reduces the chances of them committing offenses.  Therefore, allowing Mr. Camden to remain involved in these volunteer efforts will likely achieve greater crime reduction than the likely *de minimis* deterrent effect of imprisoning him.  The general deterrence (crime reduction) factor therefore strongly favors a lenient sentence.

## III.    Conclusion

For the foregoing reasons, Mr. Camden requests a sentence of home detention, community service, and a substantial fine.

Respectfully submitted,

By: /s/ Charles Burnham
Charles Burnham, Esq.
BURNHAM & GOROKHOV, PLLC
1634 I St. NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
charles@burnhamgorokhov.com